

Signed February 16, 2012.

_____

Ronald B. King
United States Chief Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| CHARLES R. SMITH AND | § | CASE NO. 07-51437-RBK |
| IRIS BERMAN-SMITH, | § | |
| | § | JOINTLY ADMINISTERED |
| | § | |
| DEBTORS | § | CHAPTER 7 |
| _____ | § | |
| | § | |
| HARVEY E. GARTLEY AND | § | |
| C. DAVID GARTLEY | § | |
| | § | |
| VS. | § | ADVERSARY NO. 07-5101-RBK |
| | § | |
| CHARLES R. SMITH AND | § | |
| IRIS BERMAN-SMITH | § | |

ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

Charles R. Smith ("Charles Smith" or "Smith") and wife, Iris Berman-Smith ("Berman-Smith")

(collectively "Debtors"), filed a voluntary Chapter 7 case on June 8, 2007.  (Case No. 07-51437,

Document No. 1.)  The original deadline for filing objections to discharge and dischargeability was

September 10, 2007.  On September 7, 2007, C. David Gartley and Harvey E. Gartley (collectively, the

"Gartleys" and/or "Plaintiffs") filed "Plaintiffs' Original Complaint Objecting to the Discharge of Specific Debts" (the "Complaint") seeking nondischargeability under: (1) § 523(a)(2)(A) for false pretenses, false representations or fraud; (2) § 523(a)(2)(B) for the use of a statement in writing, that was materially false, respecting the Debtors' financial condition or an insider's financial condition, upon which the Plaintiffs reasonably relied, that the Debtors caused to be made or published with intent to deceive; and (3) § 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. (Document No. 1.) Plaintiffs filed an amended complaint on December 3, 2007. (Document No. 15.)

Debtors' original Schedules and their Statement of Financial Affairs ("SOFA") were filed on June 21, 2007. Amended Schedules or SOFAs were filed two additional times on July 27, 2007, and August 16, 2007. The ten-day trial was held on July 28, 2008 through July 30, 2008; September 22, 2008 through September 24, 2008; October 16, 2008; October 27, 2008 through October 28, 2008; and November 10, 2008.

On January 21, 2009, the Court announced findings of fact and conclusions of law on the record after the close of the evidence, pursuant to FED. R. BANKR. P. 7052. The Court ruled in favor of Plaintiffs against Charles Smith on Counts I, VI, and VIII. The relief requested by Plaintiffs was denied on all claims against Berman-Smith, and on Counts II, III, IV, V, and VII against Charles Smith. Pursuant to FED. R. BANKR. P. 7058 and FED. R. CIV. P. 58, a separate judgment was entered on April 23, 2009. Defendant Charles Smith subsequently appealed to the United States District Court for the Western District of Texas.

On March 28, 2011, Judge Xavier Rodriguez, United States District Court, Western District of Texas, concluded that "[t]he bankruptcy judge's oral fact findings and conclusions of law are insufficient to permit meaningful review because they lack factual detail and fail to address several

2

issues raised throughout litigation." Consequently, in addition to the findings of fact and conclusions of law stated orally on the record on January 21, 2009, the Court hereby makes the following Additional Findings of Fact and Conclusions of Law.

### ADDITIONAL FINDINGS OF FACT

1.      Charles Smith is a certified public accountant licensed in Arizona. From approximately 1993 to 1995, Charles Smith was employed by Superior Auctioneers and Marketing ("Superior"), and ultimately became president. In 1995, Smith left Superior and acted as a consultant to Ken Martin ("Martin") in connection with the purchase of the Spanish Yellow Pages for Mexico ("SYP"). SYP was a Spanish language independent yellow page directory that solicited advertisements from United States business owners and was distributed in Mexico. The purchase of SYP eventually led to the formation of Alliance Media Group ("Alliance"), in which Martin was a shareholder and vice president. From 1996 to 1999, Smith was employed by Alliance as its chief financial officer ("CFO"). Alliance was in the business of producing and distributing independent yellow page directories. In the first quarter of 1999, Smith became president and chief executive officer ("CEO") of Alliance and served in that capacity until leaving Alliance on November 3, 2000. While at Alliance, Charles Smith prepared business plans and financial projections. His wife, Iris Berman-Smith, was also employed by Alliance.

2.      David and Harvey Gartley are brothers who raise venture capital and invest in startup business ventures. They became involved with Alliance toward the end of its existence to raise equity and debt financing. It was in this effort that the Gartleys were introduced to Charles Smith and Ken Martin.

3.      In November or December of 1999, Smith and Martin met with Glen Davis ("Davis") in San Antonio regarding the development of two directory concepts for the city of Houston called "In the Loop" and "Memorial" (collectively, the "Houston Directories") on behalf of Alliance. Under the

concept, two yellow page style directories would be produced and distributed.  Local businesses in Houston, Texas would purchase advertising spots in the directories.  Smith, Martin, and Davis believed the product would compete with other yellow page directories by offering advertising at cheaper rates and focusing on smaller, local businesses.

4.      In January of 2000, Smith, Martin, and Davis presented the concept to the board of Alliance and received authorization to develop the directory products.  They estimated the amount of capital needed to finance the endeavor would be approximately $1.9 million.  This amount was anticipated to come from Alliance and other investors.  Under the "In the Loop" and "Memorial" directory business concepts, it was necessary to receive payment for advertising before the directories were produced and distributed because once they were distributed, the completed product would be in circulation, and the company no longer had control or leverage over the advertisers to collect payment. The directory industry typically offered the option of a one-third down payment and the remaining payments spread over a twelve-month period of time.  Alliance remained committed to the Houston Directories concept until July, 2000.

5.      Alliance had numerous cash flow problems and ultimately filed for relief under the Bankruptcy Code on March 8, 2001(Case No. 01-51118).  The filing occurred because of a federal tax lien that arose from a $428,000 debt for unpaid payroll taxes, the nonpayment of which occurred between 1998 and 2000.  As either CFO, president, or CEO of Alliance during that time period, Charles Smith reviewed company financial statements on a regular basis and knew these taxes were outstanding.  Despite this, Smith failed to pay the outstanding taxes, penalties, and interest in the course of his employment at Alliance.

6.      At a board meeting of Alliance held on July 11, 2000, Earl Mix ("Mix") was elected to replace Smith as president and CEO.  Mix was hired because the board of directors was not satisfied

4

with Smith's operation of Alliance. In August, 2000, Smith and Mix knew that Alliance's equity value was zero and that the company was insolvent. Looking for ways to save money at Alliance, Mix was not interested in financing the Houston Directories. Ken Martin and Iris Berman-Smith were terminated from their employment with the company at this meeting.

7.    Before Mix was hired at Alliance, Smith and Martin managed the SYP accounts on behalf of the company and exerted management and oversight controls over the Houston Directories. At some point Smith and Martin conceived the idea to purchase the SYP and Houston Directories from Alliance. Although Martin was terminated from Alliance at the July 11, 2000 board meeting, he and Mix came to an agreement where Martin would take responsibility for the business development of the Houston Directories until he could find financing to purchase the directories. On October 5, 2000, Martin formed "Mediacom L.L.C." ("Mediacom") to acquire the "In the Loop," "Memorial," and SYP directories from Alliance. In October, 2000, an agreement was reached whereby Mediacom was to purchase all accounts relating to the Houston Directories and SYP from Alliance. Under the deal, Mediacom would pay $960,000 for the Houston Directories and SYP, with $265,000 being the down payment. Charles Smith resigned from Alliance on November 3, 2000, and began to work with Ken Martin to help get Mediacom in business. Smith was the brains of this startup. He developed cash flow projections, budgets, and other financial documents for Mediacom. Smith was also responsible for attending meetings and communicating with potential investors and lenders and in negotiating arrangements with vendors.

8.    In November, 2000, Smith and Martin prepared a "Mediacom L.L.C. Executive Summary" (the "Executive Summary"). It was intended to be circulated to potential lenders and investors in order to educate them about the business concept and induce them to invest in or lend to the company. Smith was listed as a "Managing Member" in the document. The Executive Summary

contained financial projections for Mediacom that were prepared by Smith, including a prediction that Mediacom's growth strategy would result in annual sales revenues of over $16 million by fiscal year end 2003.  Smith represented that he achieved $14 million in sales and a corresponding EBITDA[1] of 25% at Alliance.  The Executive Summary further projected Mediacom's gross margins in excess of 49%, and an annual EBITDA of $4.772 million would be achieved by fiscal year 2003.  In the yellow page directory business, these figures represented a company with stable cash flow.  The bulk of the projected revenues for Mediacom, however, were estimated from the outstanding receivables of Alliance in existence at the time the Executive Summary was created.  The document projected an 85% collection rate on accounts receivable and represented the industry standard for collection to be 85% to 95%.  In reality, the collection rate was closer to 60%, and the industry average was well below 85% to 95%.  As CFO, president, and CEO, Smith knew the true collection rates in the industry were far below what he represented them to be, and he inflated these figures to induce participation in the venture from potential investors and lenders.

9.     The Executive Summary did not disclose that: (1) Alliance had $428,000 of unpaid payroll taxes; (2) a federal tax lien was placed on the company's assets; and (3) Mediacom's purchase of assets from Alliance would be subject to the IRS lien.  The nonpayment of payroll taxes would have been a red flag and would have frightened away any investor or lender.  The payroll taxes continued to go unpaid in 2001 while Smith was in control of Mediacom.  Smith knew the outstanding payroll tax liability would be an issue for any potential investor and omitted this information to obtain investors and lenders for Mediacom.

---

[1]Earnings before interest, taxes, depreciation, and amortization.

10.     In November, 2000, Smith prepared a "Statement of Net Worth" dated October 31, 2000.  This document stated that his total assets of $2,594,905 included ownership of 1,923,435 common shares of Alliance stock worth a total of $1,538,748.  Smith based this figure on an offer by Ticonderoga Capital to purchase stock in Alliance, which occurred approximately one year prior to the creation of the document.  When the Statement of Net Worth was created, Smith knew of the financial difficulties facing Alliance and that the estimate was overstated.  He knew as early as August, 2000 that Alliance was insolvent and had no equity value.  He included the figure in the document in order to inflate the value of his net worth to potential investors and lenders to Mediacom.

The Statement of Net Worth represented that Smith had cash assets of $318,000.  In December, 2000, Smith used this cash to fund the "Iris Berman-Smith Family Limited Partnership" (the "Smith LP").  The partners were Iris Berman-Smith, the Smiths' two children, and "CIAC, L.L.C.," which was a company created and run by Charles Smith to serve as the general partner of Smith LP.  Smith set up Smith LP in an effort to protect this money from the contingent liabilities to which he was exposed at the time.  The Statement of Net Worth did not disclose $694,000 in existing personal guaranties executed on behalf of Alliance.  Smith's guaranties consisted of $500,000 to Transcontinental Printing, $101,000 to Citi Corp Vendor Finance, Inc., $33,000 to Fleet Business Credit, L.L.C., $35,000 to Sterling Bank, and $25,000 to Tony Karam.  Charles Smith was aware of all of these guaranties at the time he left Alliance on November 3, 2000.  He failed to include them in his Statement of Net Worth in order to inflate his personal net worth.

11.     In order to obtain institutional financing, Smith and Martin met with Pat Rutledge ("Rutledge"), Senior Vice President of Sterling Bank ("Sterling"), a number of times.  Smith developed financial projections for Mediacom to give to Rutledge to qualify for loan funding.  In October, 2000, Sterling indicated its willingness to fund a $225,000 loan so that Mediacom could acquire the Houston

7

Directories from Alliance.  On November 13, 2000, Charles Smith met with Rutledge in connection with his application for a $600,000 loan, in addition to the $225,000 which Sterling had previously committed to lend.

12.      In December, 2000, Smith authored and tendered a document titled "Compiled Financial Statements for Mediacom" that covered December 31, 2000 through May 31, 2001.  This included "Mediacom, L.L.C. Projected Statement of Revenues and Expenses" for Fiscal Year End April 30, 2001, and "Mediacom, L.L.C. Projected Statement of Revenues and Expenses" for Fiscal Year End April 30, 2002 (collectively, the "Mediacom Projections").  In connection with Smith's application for the Sterling loan, he provided Rutledge with the Executive Summary, Statement of Net Worth, and Mediacom Projections.  Smith authored numerous sets of these financial projections and distributed them to potential lenders.  He intended that these documents be relied upon by Sterling in deciding whether to lend additional funds to Mediacom.  The Mediacom Projections contained misrepresentations.  "Directory Revenues" for "Fiscal Year End 2001" were listed at $2,242,140, even though Smith knew that only $263,000 had actually been collected, and the remainder of the Directory Revenues represented uncollected money on outstanding contracts.  Smith failed to disclose that only 15% of the Directory Revenues had actually been collected and did not reveal that the industry standard collection rate on accounts receivable was approximately 60%.  The Mediacom Projections showed a cumulative loss for Mediacom as of December 31, 2000, of $22,850.  The historical statements of Mediacom, however, reflected a cumulative loss of $265,000 for Mediacom through that date.  Through his course of dealing with Rutledge, Smith did not discuss the terms of collections of the accounts receivable for Mediacom, he did not reveal any outstanding payroll tax obligations or liens, and he falsely represented Mediacom's finances.  Smith intended to deceive Sterling with these figures to induce the bank to extend credit to Mediacom.

8

13.     Loan proceeds from Sterling were not to be the sole source of financing for Mediacom. At the same time Smith and Martin were in the process of obtaining institutional loans from Sterling, they approached GTP Financial ("GTP") and David Penny ("Penny") for additional "hard money" financing.  Smith and Martin provided these lenders with copies of the Executive Summary, Statement of Net Worth, and Mediacom Projections.  In addition to their efforts to acquire institutional financing for Mediacom, Smith and Martin approached Harvey and David Gartley to secure an investment in Mediacom and locate additional investors and lenders.  In November and December, 2000, Charles Smith and Ken Martin met with Harvey and David Gartley a number of times at the Gartleys' office. Smith educated the Gartleys about the telephone directory business because the Gartleys had no prior experience in that industry.  Among other things, this information included costs for offices, employees, sales, administrative expenses, publishing costs, production prior to publishing, and distribution.  Smith represented that he had been successful in achieving good results for his part of the business while at Alliance and that, with a personnel change in the sales manager position, Mediacom would not suffer the financial problems that plagued Alliance.

14.     Smith provided the Gartleys with copies of the Mediacom Projections, the Executive Summary, and the Statement of Net Worth.  These documents contained numerous material misrepresentations about Mediacom's finances and Smith's personal finances.  As part of the startup plan, Smith represented that Mediacom was to acquire assets from Alliance using financing from various sources.  Smith and Martin represented that they obtained a $225,000 loan commitment from Sterling that was personally guaranteed by Ken Martin.  Smith told the Gartleys that he had been working with Pat Rutledge from Sterling on an additional line of credit and that they would each need to prepare a financial statement to provide to Sterling in the same format as the Statement of Net Worth prepared by Smith.

9

15.     In December, 2000, before the Gartleys agreed to become members of Mediacom, Smith and Martin made representations about the operation of the business on which the Gartleys relied.  First, they agreed that the company would run credit checks on all advertisers who sought credit of $3,000 or more.  This was important to the Gartleys because it affected the collection of receivables.  Smith represented that during his management of Alliance, the average bad debt rate was about 15%, and that it did not make financial sense to credit-check advertisers seeking less than $3,000 in credit on ads. Ultimately, no credit checks were ever performed on any advertisers by Mediacom.  The Gartleys would not have invested in Mediacom if Smith had not agreed to credit-check advertisers.  Second, Smith and Martin would be allowed $10,000 per month in compensation from Mediacom, but only in months where the company's current bills were paid and there was excess cash to fund payments to Smith and Martin.  According to their representations, if these conditions to compensation were not met, then Smith or Martin would not receive payment during that particular month.  Smith and Martin paid themselves a total of $36,000 in March, 2001 in violation of this agreement.  Third, Smith and Martin represented that it would be company policy at Mediacom to collect at least 20% down payment from advertisers and collect the balance at publication.  Fourth, Smith represented that he would follow his projected use of the Mediacom proceeds set forth in the Executive Summary in order to pay for the products and services necessary to make Mediacom profitable.  Martin represented to the Gartleys that he and Smith had already invested roughly $100,000 into Mediacom.  They requested that the Gartleys contribute $25,000 to become investors.  The men agreed that the total initial investment of $125,000 between the four of them would be repaid pro rata, and if interest were ever to be repaid on the amounts, it would also be done pro rata.  The Gartleys relied upon these representations and would not have otherwise invested in Mediacom.

10

16.     The Gartleys submitted an offer to become members of Mediacom and received a combined membership interest of 50% when Mediacom accepted the offer at its initial meeting on December 27, 2000.  The Executive Summary, Statement of Net Worth, and Mediacom Projections were provided by Smith as an inducement to invest in Mediacom and make cash advances and loans for payroll, printing, rent, and other business obligations.  The Gartleys relied on these documents to their detriment by investing in the company and advancing funds.  But for the false and misleading information presented by Smith, the Gartleys would not have gotten involved with Mediacom.  The Gartleys relied on Smith's representations contained in the Mediacom Projections, Executive Summary, and Statement of Net Worth in deciding to invest in Mediacom.

17.     If Smith had provided the Gartleys with an accurate Statement of Net Worth, it would have shown a marginal net worth, and the Gartleys would not have participated in the Mediacom venture.  To the extent there was going to be a need for cash by Mediacom before the loans were funded, the Gartleys relied on Smith's representation that he was financially able to provide funds from his liquid assets and represented net worth in excess of $2.3 million.  The Gartleys further relied upon Smith's representation of the value of his stock in Alliance as an indicator of his ability to successfully run a business of this type.  They would not have partnered with a person whose personal financial statement did not show financial stability and the ability to provide funding to Mediacom.  Additionally, if the Gartleys knew that Alliance was insolvent in December, 2000, they would not have participated in the Mediacom venture with Smith and Martin.

18.     The Gartleys would never have invested with Mediacom or Smith had they known of the existing unpaid payroll taxes or the federal tax lien.  In fact, at no point in discussions with the Gartleys prior to their investment, or any of the lenders for that matter, did Smith disclose the payroll tax issues that Mediacom inherited from Alliance.  Additionally, if the Gartleys were told the true

11

collection rate of the accounts receivable was around 60%, as opposed to the 85% to 95% Smith represented, they would have been less likely to invest.  If they knew the Directory Revenues of $2,242,140 were based on this inflated collection rate and only $263,000 had actually been collected, they would not have gotten involved.  Further, the cumulative loss of $265,000 that was represented at only $22,850 through December 31, 2000, was a material misrepresentation.  As outsiders who had a prior business relationship with Smith but no experience in the directory business, it was reasonable for the Gartleys to rely on Smith's representations in the documents he provided to them.  There were no red flags that would have rendered their reliance unreasonable.

19.     Between the efforts of Smith, Martin, and the Gartleys, a total amount of $1.9 million was raised to fund the startup of Mediacom from Sterling, GTP, and Penny (collectively, the "Lenders").  Sterling lent a total of $825,000, GTP lent $675,000, and Penny lent $400,000.  These loans were obtained based on the financial information that was prepared by Charles Smith and provided to the Lenders.  Without the Mediacom Projections, Executive Summary, and Statement of Net Worth, the Lenders would not have agreed to provide funding.

20.     From November, 2000 through April, 2001, the Gartleys were induced to guarantee indebtedness to be advanced to Mediacom by Sterling, GTP, and Penny.  In addition to the Executive Summary, Statement of Net Worth, and Mediacom Projections, Smith provided the Gartleys with "Sterling Credit Approval Projections" dated February 22, 2001, and March 1, 2001.  Those included Mediacom Revenue and Expense Reports; statements of receivables for "Houston in the Loop" and SYP dated February 28, 2001; Aging Reports; and individual statements of net worth of Smith and Martin (cumulatively referred to as the "Financial Reports").  At the time the Financial Reports were given to the Gartleys, Smith represented that the information was true and correct; however, the Financial Reports contained materially false representations beyond those in the Executive Summary,

Statement of Net Worth, and Mediacom Projections.  The Financial Reports were based on a collection rate which exceeded the rates known by Smith to be historically accurate.  In particular, the projections by Smith anticipated accounts receivable collections at a rate of approximately 85% to 90%.  Smith knew from his past experience as president, CFO, and CEO of Alliance from 1998 to 2000 that the collection rates were approximately 60% after offering substantial discounts to advertisers.

21.     The Executive Summary, Statement of Net Worth, Mediacom Projections, and Financial Reports were specifically relied upon by the Gartleys when they guaranteed loans by Sterling to Mediacom in the original amounts of $225,000 in February, 2001 and $600,000 on March 1, 2001; loans by GTP amounting to $675,000; and loans by Penny totaling $400,000.  But for the misrepresentations made by Smith within the Executive Summary, Statement of Net Worth, Mediacom Projections, and Financial Reports, Harvey and David Gartley would not have invested in Mediacom or personally guaranteed those loans.

22.     After Mediacom was formed, Ken Martin and H & D Associates, a general partnership of the Gartleys, were listed on the minutes of the initial members meeting as the sole initial members. Martin was listed as president and manager and Harvey Gartley was listed as treasurer and manager. Smith was not listed as an owner or a manager on the books of Mediacom because of a non-competition agreement that he had with Alliance.  Smith's employee salary was paid to his wife, Iris Berman-Smith, in an attempt to avoid the non-compete agreement with Alliance.  She did not work for Mediacom, although she had previously worked for Alliance. Iris Berman-Smith made no representations to the Gartleys.

23.     Although Smith was not listed on the certificate of formation as a manager or president of Mediacom, he ran the business.  He promoted the business and was in charge of its internal operations. He delegated sales operations to Ken Martin, who was listed as president and signed most

13

of the checks, but Smith was in control.  Checks were signed in blank by Martin and later filled in at the direction of Smith.  Smith was in charge of making sure the bills and payroll taxes were paid.  This was not done in many instances.  Mediacom was undercapitalized, and its numbers were off.  During the Mediacom business year 2001, there were numerous delays in production of the directories.

24.     Mediacom hired a company called "Paychex" in November, 2000 to handle the payment of payroll taxes.  In December, 2000, Paychex notified Mediacom that payroll taxes were not being paid, and sent a request for additional monies for payroll taxes.  In fact, Mediacom reached a payout agreement with Paychex for $38,500 in December, 2000 for the reimbursement of payroll tax payments by Paychex to the IRS for Mediacom's fourth quarter payroll taxes in 2000.  Paychex had an ongoing dialogue with Mediacom between January and March, 2001 regarding the payment of the withholding taxes.  In January, February, April, and May of 2001, Mediacom did not pay any payroll taxes.  Smith knew that payroll taxes were unpaid and did not disclose that fact to the Gartleys or the Lenders.  Smith prepared updated financial projections and historical information for Mediacom in May, 2001.  This was the first document prepared by Smith that reflected an outstanding liability for the nonpayment of payroll taxes.  This disclosure occurred after the Gartleys committed to invest and Mediacom received loans from the Lenders, and after the Gartleys executed personal guaranties on loans and financing totaling approximately $1.9 million.  Charles Smith failed to pay these payroll taxes and disclose their nonpayment to the Gartleys and the Lenders.  In financial projections prepared by Smith in May, 2001, Smith disclosed the unpaid payroll taxes only under "Other Accrued Liabilities" and did not otherwise bring these liabilities to the attention of any investor or lender.

25.     Between April and May, 2001, "In the Loop" and "Memorial" were submitted to the publisher and printed.  By June and July of 2001, Mediacom distributed some of the directories and was receiving revenue.  Many of the directories, however, were not actually distributed.  Approximately

14

5,000 "In the Loop" and "Memorial" directories were picked up and distributed, but thousands more were not picked up or distributed because the printer was not paid and refused to release the printed directories from its possession.  The Gartleys were not aware of this until after they gained control of Mediacom.

26.     Between March, 2001 and September, 2001, Smith and Martin requested that the Gartleys themselves make additional loans to Mediacom in order to fund Mediacom's cash needs, including loans to satisfy payroll obligations and to print directories.  Still relying on Smith and Martin's representations and materially false financial documents, the Gartleys made additional personal loans to Mediacom to be used for Mediacom's specific business purposes, as represented and agreed by Smith and Martin.  In June, 2001, Charles Smith and Ken Martin approached the Gartleys and asked them to invest more money.  Each of the four agreed to put an additional $25,000 into the business.  In exchange for their agreement to invest more funds, Smith and Martin agreed that going forward from June, 2001, they would not take any compensation from Mediacom.  The Gartleys each wired $25,000 to Mediacom, but Smith and Martin never paid any funds.  Furthermore, despite their representations that they would not take any more compensation, Smith and Martin both took executive compensation throughout 2001.

27.     In September, 2001, Martin and Smith opened a checking account for Mediacom at Frost National Bank, but did not disclose this to Harvey and David Gartley.  Payroll payments and other ordinary expenses were paid from this account, but not tax deposits.  Checks were drawn on this account that were not appropriate on their face.  These checks included payments to Martin and Smith, classified as "Senior Management–Payroll," a payment to Edge Capital classified as a repayment of a loan to Mediacom by Smith, checks to Martin and Smith for $2,000 each classified as "Expenses," checks for "Cash," checks payable to Kelly Wilness classified as "Expense," and amounts paid to

15

Martin and Edge Capital classified as payments on "Loan from KM" and "Loan from CS." The account was created and opened by Smith without authorization, using outdated and superseded corporate records, which falsely appeared to provide Smith with authority to open accounts and sign checks on behalf of Mediacom. It was funded in circumvention of an agreement whereby GTP was to directly receive proceeds of certain receivables that had been pledged as security for GTP's loan to Mediacom. Smith's unauthorized use of Mediacom funds included at a minimum: (a) $13,000 in checks payable to himself; (b) $2,600 in checks payable to Edge Capital; (c) $960 in payment of personal loans; (d) $2,611 in cash withdrawals; (e) $1,125 in payments to Martin's father-in-law; and (f) $1,000 in payments to a business associate, Hector Silva. Smith also personally authorized disbursements to Martin in the amount of $16,828 from the Frost account.

28.     This unauthorized diversion of funds was discovered in October, 2001, and as a result, GTP demanded that the diverted funds be repaid immediately. Charles Smith advised the Gartleys that Mediacom did not have any funds available to repay GTP, and falsely represented that the receivable proceeds had been used by Smith for legitimate Mediacom expenses. Smith's statements were made to induce the Gartleys to contribute additional funds to satisfy half of the obligation to GTP that arose through Smith's unauthorized manipulation of GTP receivables. In reliance on Smith's misrepresentations, the Gartleys personally repaid one-half of those amounts, and Smith and Martin represented they would cover the other one-half. Instead, Smith and Martin wrote a number of Mediacom checks to GTP to cover the obligation as described above. Compounding the problem, all but one of these checks were dishonored by the bank for insufficient funds. This eventually required the Gartleys to perform on the personal guaranties of the GTP loans to Mediacom for a total payment of $622,000.

16

29.     On November 1, 2001, Mediacom was still having serious cash flow problems.  The Gartleys came to believe that the problems with Mediacom were because of the management of Charles Smith and Ken Martin, and the Gartleys took total control of Mediacom.  For the first time, they were able to review many of Mediacom's business records that reflected the true financial condition of the company.  Thereafter, the Gartleys began to realize the extent of Smith and Martin's mismanagement and misrepresentations.

30.     Among other things, it was discovered that Smith and Martin: (1) failed to timely remit payroll taxes to the federal government during 2000 and 2001; (2) failed to report and pay taxes due to the Texas Workforce Commission; (3) entered into transactions and arrangements that were neither authorized by Mediacom nor in the company's best interest; (4) paid themselves compensation for services in breach of the governing agreement; (5) opened and utilized at least one checking account, without authorization, in order to funnel improper payments from Mediacom to themselves and related persons and entities; (6) provided false and misleading financial statements and financial information to the Gartleys and others to obtain money and personal guaranties; (7) converted company funds through unauthorized payments from Mediacom to themselves as well as family members, friends, and affiliated entities, including Edge Capital and Berman-Smith; (8) diverted payments on certain receivables which were to be delivered directly to GTP, triggering the Gartleys' guaranty obligations; (9) made use of Mediacom's resources for non-company purposes, including the operation of Edge Capital; (10) maintained misleading and inaccurate books and records of Mediacom; (11) failed to make matching contributions despite representations that Smith would personally match those made by the Gartleys; (12) failed to use money advanced by the Gartleys for the purposes for which he represented it would be used; and (13) paid excessive fees for consulting work performed by friends and associates.

31.     Despite the numerous cash infusions and other efforts by the Gartleys, Mediacom was forced to cease its business operations.  Unable to pay its debts, Mediacom defaulted on its loans from the Lenders.  Smith, Martin, and the Gartleys were sued as personal guarantors, and the Gartleys were eventually required to pay more than $1.7 million as a result of their guaranty obligations to Mediacom's Lenders.  Smith and Martin failed to pay their proportionate share of the guaranteed debt. In addition to the loan obligations by the Gartleys to Sterling, GTP, and Penny, the Gartleys paid at least $895,000 on other Mediacom obligations and cash injections to the company.

32.     On January 4, 2002, Mediacom and the Gartleys filed a state court lawsuit against Martin, Smith, and Iris Berman-Smith.  On June 12, 2002, the parties executed a settlement agreement in the state court case (the "Settlement Agreement").  Under the Settlement Agreement, Martin and Smith had 120 days to obtain third-party financing to buy the Gartleys' interest in Mediacom.  In return, the Gartleys dismissed the lawsuit without prejudice.  The Gartleys and Mediacom agreed not to refile the lawsuit for 120 days.  In the event Smith did not purchase the Gartleys' membership interest within 120 days from the execution of the agreement or if Smith failed to honor any obligation, the Gartleys were authorized to file a new lawsuit against Smith.

33.     The terms of that Settlement Agreement acknowledged that the parties signed a separate "Tolling Agreement."  The Tolling Agreement suspended defenses based on limitations for 120 days from the day the Settlement Agreement was executed on June 12, 2002.  Under the Tolling Agreement, limitations for the Gartleys to refile were suspended a total of 280 days from January 4, 2002 through October 10, 2002.  The Settlement Agreement was breached when Smith and Martin failed to find third-party financing to buy out the Gartleys within the 120 day time limit.

In August, 2003, Mediacom and the Gartleys filed another state court action against  Charles Smith and Iris Berman-Smith.  Martin filed a Chapter 7 case in this district on August 6, 2003, and

18

received a discharge (Case No. 03-51812).  His liability to the Gartleys and Mediacom was not discharged, however, by an agreed judgment entered in Adversary Proceeding No. 03-5124 on February 1, 2005.  Smith filed this bankruptcy case in 2007.  The Gartleys filed a proof of claim in the amount of $2,700,000 on October 5, 2007.  Neither the Smiths nor any other party has objected to Gartleys' proof of claim.  The Gartleys initiated this adversary proceeding generally incorporating the Gartleys' state court claims against the Smiths and requesting that they be liquidated and declared nondischargeable under 11 U.S.C. § 523(a)(2) and (4).  In addition, the Gartleys asserted claims against Smith for contribution and indemnity as a result of his failure to pay his obligations as a co-guarantor of debts owed to Sterling, GTP, and Penny.

### ADDITIONAL CONCLUSIONS OF LAW

1.    *Standing*.

A corporate officer owes a fiduciary duty to the shareholders collectively, i.e., the corporation, but traditionally does not occupy a fiduciary relationship with an individual shareholder.  *Faour v. Faour*, 789 S.W.2d 620, 621-22 (Tex. App.–Texarkana 1990, writ denied).  A corporate shareholder, however, has an individual cause of action for wrongs done to him where the wrongdoer violates a duty owing directly by him to the shareholder.  *Id*. at 622.  This principle is not an exception to the general rule, but is a recognition that a shareholder may sue for violation of his individual rights regardless of whether the corporation also has a cause of action.  *Id*.  It is the nature of the wrong, whether directed against the corporation only or against the shareholder personally, not the existence of injury, which determines who may sue.  *Id*.

In the present case, Mediacom was under the control of Charles Smith and Ken Martin.  Smith had a preexisting relationship with the Gartleys from their efforts to secure financing for Alliance Media.  In November, 2000, Smith approached the Gartleys in an effort to induce them to invest in

19

Mediacom.  He prepared and tendered financial documents with materially false information and made numerous false representations to the Gartleys about his personal finances and those of Mediacom. Smith failed to disclose that Mediacom was being  formed by purchasing assets encumbered with a federal tax lien.  Moreover, Charles Smith represented to the Gartleys that he had extensive experience in the telephone directory business and had successfully run a company engaged in those activities prior to joining Mediacom.  Smith knew that the Gartleys were relying on his financial representations in deciding to become owners at Mediacom.  Once he induced the Gartleys to become owners, he continued his misrepresentations and abused his position of trust and confidence to obtain personal guaranties from the Gartleys for Mediacom's outstanding loans.  As co-owners of Mediacom, who relied upon Smith's misrepresentations and were induced thereby to invest funds and personally guarantee the company's outstanding debt, the Gartleys were directly harmed by Smith's actions and have standing to assert their claims.

2.      ***Capacity***.

Smith argues that the Gartleys do not have standing or capacity to bring their claims against Charles Smith.  A challenge to a shareholder's right to bring a cause of action for wrongs done to the corporation raises a question of capacity.  ***Pledger v. Schoellkopf***, 762 S.W.2d 145, 146 (Tex. 1988); ***Prostok v. Browning***, 112 S.W.3d 876, 921 (Tex. App.–Dallas 2003), *rev'd on other grounds*, 165 S.W.3d 336 (Tex. 2005); ***Nauslar v. Coors Brewing Co***., 170 S.W.3d 242, 249-50 (Tex. App.–Dallas 2005, no pet.) (challenge to a stakeholder's bringing a suit to recover *personally* may raise both issues of standing and capacity).

An individual stakeholder in a legal entity does not have a right to recover personally for harms done to the legal entity.  ***Wingate v. Hajdik***, 795 S.W.2d 717, 719 (Tex. 1990).  In ***Wingate***, one corporate shareholder sued another, alleging he had misappropriated corporate assets.  ***Id***. at 717.  The

20

court ruled that individual stockholders have no separate, independent right of action for injuries suffered by the corporation when the injuries merely result in depreciation of the value of plaintiffs' stock.  *Id*. at 719.  In the present case, the Gartley brothers suffered injuries above and beyond a mere reduction in the value of their stock in Mediacom.  They were fraudulently induced by Charles Smith to become investors in Mediacom and to execute personal guaranties to lenders on approximately $1.7 million in loans and lines of credit.  They asserted causes of action against Smith not for the loss in value of their stock in Mediacom, but for the fraud which induced the Gartleys to become involved and for the damages that flowed therefrom.  The Gartley brothers have capacity to assert their claims against Smith.

3.      *Limitations*.

        Smith claims that all of Plaintiffs' claims are barred by limitations.  The relationship giving rise to Plaintiffs' causes of action against Debtors originated in November, 2000 and culminated in November, 2001.  On November 1, 2001, the Gartleys ousted Smith and Martin from control at Mediacom, and for the first time were able to access Mediacom financial records and discover the truth regarding the company's financial health.  Before this date, the Gartleys did not have access to financial records of the company, and thus could not have discovered the frauds perpetrated by Smith and Martin.  Therefore, with the exceptions of contribution and dischargeability, November 1, 2001, is the operative date for the accrual of Plaintiffs' causes of action because on that date, the Gartley brothers took over sole control of Mediacom, ousted Charles Smith from control, and gained access to the financial records of Mediacom.  The statute of limitations is four years for: (1) common law and statutory fraud; (2) breach of contract; (3) violations of the Texas Theft Liability Act; (4) contribution; and (5) misappropriation of funds.  TEX. CIV. PRAC. & REM. CODE § 16.004(a) (Vernon 2002).  Under these statutes of limitations, Plaintiffs were required to file suit no later than November 1, 2005.

On January 4, 2002, the Gartleys' claims against Smith were set forth within a state court proceeding filed by the Gartleys and Mediacom under Cause No. 2002-CI-00185, before the 408th Judicial District Court of Bexar County, Texas.  That proceeding was brought against Martin and the Smiths for common law and statutory fraud, breach of the Texas Theft Liability Act, misappropriation of funds, breach of contract, conspiracy, and securities fraud.

On June 13, 2002, the original state court case was dismissed without prejudice pursuant to the terms of a Settlement Agreement entered into between the parties, subject to a right of refiling upon default.  Under the Settlement Agreement, Charles Smith was to purchase the Gartleys' interest in Mediacom within 120 days.  As part of the Settlement Agreement, the parties executed a Tolling Agreement to toll limitations for 280 days from January 4, 2002 through October 10, 2002.  *See Squyres v. Christian*, 253 S.W.2d 470, 472 (Tex. Civ. App.–Fort Worth 1952, writ ref'd n.r.e.) (waiver of statute of limitations before bar has fallen is permissible so long as waiver is specific and for reasonable time).

Thereafter, as a result of Smith's failure to purchase the Gartleys' interest in Mediacom and to pay all guaranteed obligations owed to the Lenders, the Gartleys refiled the lawsuit on August 25, 2003, under Cause No. 2003-CI-13069, pending before the 45th Judicial District Court of Bexar County, Texas.  The Gartleys' second lawsuit against Smith was set for trial on June 18, 2007, but was stayed as a direct result of Smith's June 8, 2007 Chapter 7 bankruptcy filing.  The second lawsuit remains in good standing and is ready for trial, subject to relief from the automatic stay.  Smith did not raise limitations as an affirmative defense within his response to the state court lawsuit.  On September 7, 2007, Harvey and David Gartley, but not Mediacom, filed this adversary proceeding against Smith.  In their causes of action, the Gartleys for the first time attempted to individually assert claims for: (1) violation of the Texas Theft Liability Act; (2) misappropriation of funds; and (3) breach of contract.

22

It is undisputed that all claims, except for contribution and dischargeability, accrued on November 1, 2001. The longest limitations period is four years, giving the Gartleys until November 1, 2005, to file their claims against Debtors. After tacking the 280 days from the Tolling Agreement, the limitations period expired on August 8, 2006. The Gartleys satisfied the statute of limitations when they filed in their individual capacities against the Smiths for common law and statutory fraud in state court proceedings in 2002, and again in 2003.

In the state court proceedings, however, it was only Mediacom that asserted claims for: (1) violation of the Texas Theft Liability Act; (2) misappropriation of funds; and (3) breach of contract. This bankruptcy case was filed on June 8, 2007, and the Gartley brothers filed this adversary proceeding on September 7, 2007, for the first time asserting these causes of actions individually. Using the bankruptcy filing date, the statute of limitations has run for the Gartleys to assert these claims individually.

4. ***Statute of Frauds.***

Smith asserts the Statute of Frauds as a defense to the Gartleys' breach of contract claims because there was no evidence of a writing signed by Smith in which he made a promise to make a contribution to Mediacom. Limitations for the Gartleys to individually file a cause of action for breach of contract against Smith expired on August 8, 2006, and the claim is time barred. The Statute of Frauds argument is therefore moot.

5. ***Breach of Contract.***

As discussed above, the statute of limitations expired for the Gartley brothers to file a cause of action for breach of contract. With the Tolling Agreement considered, limitations for the Gartley brothers to individually file a breach of contract claim against Smith ran on August 8, 2006. The bankruptcy case was filed June 8, 2007, and the Gartley brothers did not individually assert a breach

of contract claim until they filed this adversary proceeding.  Accordingly, limitations has run on the breach of contract claims.

6.      ***Texas Theft Liability Act***.

As discussed above, the statute of limitations expired for the Gartleys to individually file a cause of action under the Texas Theft Liability Act on August 8, 2006.  Only Mediacom asserted this claim in the state court proceedings.  When this adversary proceeding was filed in 2007, the Gartleys did not include Mediacom as a plaintiff.  Therefore, limitations to file an individual cause of action under the Texas Theft Liability Act had run, and the Gartleys may not obtain relief on that cause of action.  Nonetheless, Debtors are not entitled to attorney's fees under the Texas Theft Liability Act as a prevailing party.

Under the Texas Theft Liability Act, a person who commits theft is liable for the damages resulting from the theft.  TEX. CIV. PRAC. & REM. CODE § 134.003 (Vernon 2011).  The Act provides that "[e]ach person who prevails in a suit under this chapter shall be awarded court costs and reasonable and necessary attorney's fees.  ***Id***. at § 134.005(b).  At trial, this Court denied relief to the Gartleys under the Texas Theft Liability Act.  Debtors assert that because relief was denied to the Plaintiffs on that claim, Debtors are a prevailing party entitled to an award of attorney's fees in defending against the Texas Theft Liability Act claim.

In ***Intercontinental Group Partnership v. KB Home Lone Star, L.P.***, 295 S.W.3d 650, 655-57 (Tex. 2009), the Texas Supreme Court held that a party who did not recover damages could not be a prevailing party in a breach of contract action.  That reasoning was extended to the Texas Theft Liability Act in ***Glattly v. Air Starter Components, Inc.***, 332 S.W.3d 620, 641 (Tex. App.–Houston [1st Dist.] 2010, pet. denied).  In this adversary proceeding, the Gartleys were the prevailing party because

24

they obtained a judgment against Smith in excess of $2.6 million on a number of claims.   The Smiths, however, did not recover damages on any claim and are not a prevailing party.

7.     *Common Law Fraud*.

Under Texas law, the elements of common law fraud are: (1) a material representation that was false made by the defendant; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation, and thereby suffered injury.  *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co*., 51 S.W.3d 573, 577 (Tex. 2001).  Charles Smith's entire course of dealing with Harvey and David Gartley was fraudulent, from the initial meetings and distribution of financial documents through November 1, 2001, when the Gartleys finally ousted Smith from Mediacom and began to discover the extent of Smith's deceptions.

Charles Smith made numerous materially false representations, which he either knew to be false or made recklessly as a positive assertion, without knowledge of their truth or falsity.  These were contained in numerous documents prepared by Charles Smith.  In the Statement of Net Worth, Smith represented the value of "Investment in Alliance Media Group, Inc." to be $1,538,748.  Smith further represented the value of his Alliance stock to be $1,538,748 on a "Statement of Net Worth" dated February 1, 2001.  Testimony at trial, however, showed that Smith knew as early as August, 2000 that Alliance was insolvent and had no equity value.  He further misrepresented the amount of "Contingent Liabilities" to be $18,700.  At the time he created the Statement of Net Worth, Smith was a personal guarantor on behalf of Alliance on loans of $694,000 that he executed while at the company.  This included $500,000 to Transcontinental Printing, $101,000 to Citi Corp Vendor Finance, Inc., $33,000

25

to Fleet Business Credit, L.L.C., $35,000 to Sterling Bank, and $25,000 to Tony Karam.  Smith was aware of all of these guaranties at the time he left Alliance Media on November 3, 2000.

Moreover, Smith listed the value of "Cash" at $318,258 on the Statement of Net Worth.  In December, 2000, Smith took this money and put it into the "Iris Berman-Smith Family Limited Partnership."  Smith intended to deceive the Gartleys into believing he had the financial ability to be a partner in Mediacom and would be readily able and willing to contribute cash to the endeavor, while he was taking actions to protect these funds from creditors.  Smith intentionally misstated the values on his Statement of Net Worth in order to inflate his net worth and financial liquidity for the purposes of inducing the Gartley brothers to invest with him in Mediacom and execute personal guaranties on the loans of Mediacom.

The Mediacom projections and financial reports also contained numerous misrepresentations about the company's finances.  The collection rate on the accounts receivable was materially overstated.  Further, the directory revenues were materially misrepresented as money that had been collected, when only a fraction of the amount was actually collected, and the remainder was based on the misrepresented collection rate.  Mediacom's cumulative losses were materially understated.

The Gartleys actually and justifiably relied upon the Executive Summary, Statement of Net Worth, Mediacom Projections, and Financial Reports as true representations of the financial state of affairs of Mediacom when these documents contained materially false information.  In reliance on these representations, the Gartleys became members of Mediacom, executed personal guaranties on the company's outstanding loans, and advanced substantial funds to Mediacom.

It was reasonable for the Gartleys to rely on Smith's misrepresentations in light of: (1) the preexisting relationship between the Gartleys and Smith; (2) the financial information contained in the Statement of Net Worth, Executive Summary, Mediacom Projections, and Financial Reports; (3)

26

Smith's representations of historical success in running telephone directory companies; and (4) Smith's success in procuring institutional lenders.  Smith knew the Gartley brothers had no prior experience in the telephone directory business and falsely created the appearance of a promising business opportunity.

The Financial Reports were specifically relied upon by the Gartleys when they guaranteed loans by Sterling to Mediacom in the original amounts of $225,000 in February, 2001, and $600,000 on March 1, 2001; loans by GTP Financial amounting to $675,000; and loans by David Penny totaling $400,000.  But for the misrepresentations made by Smith within the Executive Summary, Statement of Net Worth, Mediacom Projections, and Financial Reports, Harvey and David Gartley would not have invested in Mediacom or personally guaranteed those loans.  At the time the Financial Reports were given to the Gartleys, Smith represented that the information was true and correct; however, the Financial Reports contained materially false representations.

The Gartleys suffered out of pocket economic damages, both actual and consequential, from their reliance on Smith's fraudulent misrepresentations in the total amount of $2,657,000, representing: (1) funds advanced by the Gartleys under the terms of the guaranties of debt to Sterling, GTP, and David Penny; and (2) funds advanced for payment of Mediacom's operating expenses, including payroll and Texas Workforce Commission debt, rent, accounting, legal, and other operational expenses. $1,762,000 represents what the Gartleys paid on the personal guaranties they executed to secure Mediacom's outstanding loans.  This included $735,000 to Sterling, $622,000 to GTP Financial, and $400,000 to David Penny.  The remaining $895,000 of the damages represents funds advanced by the Gartleys to Mediacom in loans, infusions, payment of debt and overhead, and other expenses.  The Settlement Agreement dated June 13, 2002, between the Gartleys, Smith, and Martin confirms Smith's agreement that monies owed to the Gartleys–exclusive of the guaranty obligations–amount to $895,000.

8.     *Fraud by Omission*.

To establish fraud by omission, a plaintiff must prove that: (1) the defendant failed to disclose the facts to the plaintiff; (2) the defendant had a duty to disclose those facts; (3) the facts were material; (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts; (5) the defendant was deliberately silent when it had a duty to speak; (6) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting; (7) the plaintiff relied on the defendant's nondisclosure; and (8) the plaintiff was injured as a result of acting without that knowledge. *7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc*., 245 S.W.3d 488, 507 n.27 (Tex.  App.–Houston [14th Dist.] 2007, pet. denied) (op. on reh'g).  Fraud by omission is a subcategory of fraud because the omission or nondisclosure may be as misleading as a positive misrepresentation of fact where a party has a duty to disclose. *Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos*., 217 S.W.3d 653, 670 (Tex. App.–Houston [14th Dist.] 2006, pet. denied).

Mediacom was formed to acquire the "Houston in the Loop," "Memorial," and SYP directories from Alliance in late 2000.  Alliance, however, had a $428,000 federal tax lien placed on its assets because of unpaid payroll taxes for the years from 1998 to 2000.  As CFO, president, and CEO of Alliance during that time period, Smith knew these taxes were outstanding and failed to pay them.  Smith concealed the outstanding IRS liability from Alliance's board of directors.

Mediacom acquired the directory accounts from Alliance as part of its plan of reorganization, and Smith knew that the accounts were encumbered with the federal tax lien.  Smith had a duty to disclose these facts to the Gartleys in the course of seeking their investment and participation in Mediacom because the nondisclosure amounted to a material misrepresentation.  The existence of over $400,000 in federal tax liens on a company's assets is a material fact that any potential investor would

28

want to know before deciding to invest in a company and personally guarantee nearly $2 million in outstanding debt.  As potential investors, the Gartleys were owed full disclosure of the company's financial affairs.  As outsiders, they did not have access to Alliance's financial records.

Smith failed to disclose the existence of this lien in any of the financial documents he provided to the Gartleys in order to make Mediacom appear financially appealing and to induce them to become members, invest funds, and personally guarantee loans.  Further, the Gartleys actually relied on this omission by investing in Mediacom and personally guaranteeing loans.  Had the existence of the tax liens been disclosed, the Gartleys would not have participated in the Mediacom investment, and they were injured as a result of investing without this knowledge by their out of pocket loss of $2,657,000. The elements of fraud by omission have been satisfied.

9.      ***Denial of Dischargeability under 11 U.S.C. § 523(a)(2)(A)***.

A debt that is obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition, is nondischargeable in bankruptcy. 11 U.S.C. § 523(a)(2)(A).  For a debt to be nondischargeable under 11 U.S.C. § 523(a)(2)(A), the objecting creditor must prove that: (1) the debtor made representations; (2) at the time they were made, the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) the creditor justifiably relied on such representations; and (5) the creditor sustained losses as a proximate result of its reliance.  ***Gen. Elec. Capital Corp. v. Acosta*** (***In re Acosta***), 406 F.3d 367, 372 (5th Cir. 2005).

In this case, Smith's representations and statements were materially false representations upon which the Gartleys relied, which were published with the intent to deceive.  Particularly, the Executive Summary, Statement of Net Worth, Mediacom Projections, and Financial Reports authored by Smith contained materially false representations respecting Smith's and Mediacom's financial condition.

29

Smith intended to deceive the Gartleys by this information so they would be induced to invest in Mediacom and become personal guarantors on its loans. The Gartleys relied upon these representations in deciding to become members of Mediacom and executing personal guaranties, and they were damaged as a proximate result of Smith's misrepresentations. The elements of nondischargeability are satisfied, and the Gartleys' judgment is nondischargeable under 11 U.S.C. § 523(a)(2)(A).

10.    *Denial of Dischargeability under 11 U.S.C. § 523(a)(2)(B)*.

A debt is nondischargeable in bankruptcy that is obtained by use of a written statement: (1) that is materially false; (2) respecting the debtor's or an insider's financial condition; (3) on which the creditor to whom the debtor is liable reasonably relied; and (4) that the debtor caused to be made or published with the intent to deceive. 11 U.S.C. § 523(a)(2)(B). A statement is materially false if it paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit. *Norris v. First Nat'l Bank in Luling* (*In re Norris*), 70 F.3d 27, 30 n.10 (5th Cir. 1995).

As discussed above, Smith created several materially false written statements respecting both his personal financial condition and the financial condition of Mediacom. The Gartleys relied on these documents when they invested in Mediacom and executed personal guaranties of loans of the company. Further, it was reasonable for the Gartleys to rely on Smith's representations because he was an insider at Alliance and a founder of Mediacom; he represented that he had extensive experience and success in the business; and he provided false financial documents that made his personal finances and those of Mediacom appear liquid and stable. Smith presented these financial documents to the Gartleys while acquiring loans and credit from lenders who did in fact provide funds to the company. In light of the circumstances surrounding the receipt of these documents, the nondisclosure of the true financial

30

condition of Smith and Mediacom, and the Gartleys' inability as outsiders to assess the truth, it was entirely reasonable for them to rely on these documents.

Finally, Smith published these documents with the intent to deceive. Smith knew as early as August, 2000 that the value of Alliance stock was not $1.5 million. As president and CFO of Alliance, he knew that the company was insolvent and had no equity. He further intentionally failed to disclose the federal tax lien that he knew existed on the accounts Mediacom was to acquire. Smith represented a false state of affairs to the Gartleys in order to persuade them to invest in the company and execute personal guaranties on Mediacom's indebtedness. Accordingly, reliance upon the false financial statements caused the Gartleys $2,657,000 in damages, and they have satisfied the elements of nondischargeability under 11 U.S.C. § 523(a)(2)(B).

### CONCLUSION

These Additional Findings of Fact and Conclusions of Law are rendered in support of the judgment of this Court previously entered on April 23, 2009, pursuant to FED. R. BANKR. P. 7058 and FED. R. CIV. P. 58.

Any Finding of Fact which should more appropriately be characterized as a Conclusion of Law shall be considered a Conclusion of Law herein. Similarly, any Conclusion of Law which should more appropriately be characterized as a Finding of Fact shall be considered as a Finding of Fact herein.

# # #